# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| MICHAEL MOHR, | } |
| | } |
|     Plaintiff, | } |
| | } |
| v. | }   Case No.:  5:14-cv-00045-MHH |
| | } |
| SCIENCE AND ENGINEERING | } |
| SERVICES, INC.; SCIENCE AND | } |
| ENGINEERING SERVICES, LLC; | } |
| SES HOLDING CO., INC.; and | } |
| HAROLD G. SOWERS, | } |
| | } |
|     Defendants. | } |

## MEMORANDUM OPINION

### I.  Introduction

Michael Mohr served with honor in the United States Army, where he was trained in aircraft maintenance and repair.  Following his discharge, Mr. Mohr used the skills he had acquired as an aviation mechanic to secure a job at DynCorp International performing maintenance on Apache helicopters.  While at DynCorp, Mr. Mohr not only honed his skills as an aviation mechanic but also taught himself how to write computer programs.

When DynCorp secured a contract with Boeing Company to depopulate Apaches, Mr. Mohr became involved in that project.  "Depopulation" is one part of

a recycling process for aircraft parts.  During depopulation, thousands of parts are removed from an aircraft.  Some of the removed parts are assembled into manufacturing kits for re-use on a new model.  Some of the removed parts are held as replacements for parts on the existing model.  Other parts are simply scrapped.

To facilitate the laborious and detailed manual work of disassembling aircraft, on his own initiative, Mr. Mohr developed a computer program that generated Excel spreadsheets to help DynCorp mechanics track the parts of the helicopters that they depopulated.  Mr. Mohr's programming skills became so valuable to DynCorp that the company eventually changed Mr. Mohr's job title from mechanic to computer programmer, and tracking parts and otherwise supporting the depopulation effort with information technology became Mr. Mohr's primary assignment.  Ultimately, Mr. Mohr's efforts contributed to the creation of the Aviation Maintenance Inventory Program (AMIP), a computer program that allowed DynCorp to substantially increase the efficiency of the depopulation process.

When Boeing moved its depopulation work to Science and Engineering Services, Inc., Mr. Mohr moved too.  Mr. Mohr brought his copy of AMIP to SES and registered a copyright on the AMIP computer program.

At SES, Mr. Mohr deployed AMIP to support the Apache depopulation effort and then copied AMIP to create BMIP for the depopulation of Blackhawk

2

helicopters and DMIP for the depopulation of Apache Delta model helicopters. Mr. Mohr made numerous changes to the AMIP, BMIP, and DMIP source code to address requests from SES personnel and clients, add new functionality, and fix errors. Mr. Mohr also drafted a license that gave SES permission to use AMIP under certain conditions.

As the use of AMIP and its related programs grew, Mr. Mohr became concerned that the terms of the license were not being honored. Mr. Mohr also felt that his working environment had become hostile. Mr. Mohr raised his concerns with the management at SES, but the resulting negotiations failed to produce an agreement to purchase or a new license for AMIP. Subsequently, Mr. Mohr sent a letter of involuntary resignation to SES and instituted this civil action.

In this lawsuit, Mr. Mohr asserts claims against Science and Engineering Services, Inc., Science and Engineering Services, LLC, SES Holding Co., Inc., and Harold G. "Bud" Sowers. (Doc. 35, pp. 2-3).[1] For ease of reference, in this opinion, the Court will refer to the defendants collectively as SES. Mr. Mohr asserts against SES a federal cause of action for copyright infringement under 17 U.S.C. § 501 and state law claims for breach of contract, unjust enrichment, conversion, accounting, defamation, intentional interference with business relations, conspiracy, and fraud. (Doc. 35). The defendants have filed a

---

[1] Mr. Mohr's "Amended and Restated Complaint," which is Document 35 in the Clerk's Record, is the operative pleading in this action.

3

counterclaim, in which they ask the court to declare that Mr. Mohr's copyright is invalid. (Doc. 43). This matter is before the Court on Mr. Mohr's motion for partial summary judgment on his copyright infringement claim and the defendants' motion for summary judgment on Mr. Mohr's claims. (Docs. 73, 76).

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, a court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that

4

there is no genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service,* 456 F.3d 1270, 1274 (11th Cir. 2006)  (citing *Martin v. Alamo Community College Dist.,* 353 F.3d 409, 412 (5th Cir. 2003)).

"In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotation marks and brackets omitted) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)).  "If both parties proceed on the same legal theory and rely on the same material facts . . . the case is ripe for summary judgment." *Id.* (internal quotation marks omitted) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)).

## III.   Factual Background

Michael Mohr joined the U.S. Army in 1999.  (Doc. 27, p. 31; Doc. 75-36, pp. 4–5).  After completing basic training, Mr. Mohr received advanced individual training as "an aircraft engine mechanic on the Kiowa, Apache, Black Hawk, and Chinook helicopters."  (Doc. 27, p. 31).  The Army assigned Mr. Mohr to a duty station in Germany, where Mr. Mohr continued to learn about the assembly,

maintenance, and repair of various types of aircraft.  (Doc. 27, p. 31).  Beginning in 2004, Mr. Mohr served a one-year tour of duty in Iraq as a platoon sergeant. (Doc. 27, p. 32; Doc. 75-36, p. 4).  Following his service in Iraq, Mr. Mohr was honorably discharged from the Army.  (Doc. 27, p. 32).

In 2005, Mr. Mohr returned home to Texas and found work with DynCorp as an aircraft mechanic at the San Angelo Army Facility.  (Doc. 27, pp. 32–33; Doc. 75-12; Doc. 75-36, p. 4).  DynCorp is a government contractor.  While working for DynCorp, Mr. Mohr met Harold "Bud" Sowers, a civilian government employee who worked in the Army's Apache project management office.  (Doc. 27, pp. 33–34; Doc. 75-5, ¶ 3).  Among other duties, Mr. Sowers oversaw the Army's depopulation of Apache helicopters.  The Army used this process to disassemble older-model Apaches, track the condition of the parts that were removed, and package certain parts for re-use on upgraded Apaches.  (Doc. 27, pp. 34–35; Doc. 33, pp. 271–72; Doc. 72-3, pp. 11–16; Doc. 75-5, pp. 2–3).  The parts that were not incorporated into a new Apache model were stored for later use as replacement parts on the current model or disposed of as scrap.  (Doc. 33, pp. 271–72; Doc. 86-4, ¶ 6).

The depopulation process initially took place at the Corpus Christi Army Depot and at a facility in Mesa, Arizona run by the Boeing Company, the manufacturer of the Apache helicopter.  (Doc. 33, p. 272; Doc. 75-36, p. 4; Doc.

72-3, p. 10).  Later, some aircraft were sent to San Angelo for depopulation, and parts were shipped from San Angelo to Boeing or Corpus Christi for repair or use in the manufacture of new Apaches.  (Doc. 75-36, p. 4; Doc. 86-4, ¶ 6; Doc. 33, p. 271).  When San Angelo first became involved in the depopulation program, Mr. Mohr and the other mechanics carrying out the depopulation process used printed parts lists and handwritten tags to manually track parts as mechanics removed them from the aircraft.  (Doc. 72-3, p. 18; Doc. 75-5, ¶ 6; Doc. 33, pp. 272–73; Doc. 86-4, ¶ 3; Doc. 75-10, pp. 14–15).

To aid in the labelling of the thousands of parts for each helicopter, Corpus Christi hired Robbins-Gioia, a program management services company, to develop a computer program "to print the tags and also track the parts as they came off of the aircraft."  (Doc. 75-5, ¶ 6; *see also* Doc. 33, pp. 273–74; Doc. 75-3, ¶ 4).  The program developed by Robbins-Gioia was called the Programmed Depot Maintenance Scheduling System or PDMSS.  (Doc. 75-16, p. 2; Doc. 75-5, ¶ 6).  After the Army transferred some of the depopulation work from Corpus Christi to San Angelo, Miles Keller and Mark Sampson, two Robbins-Gioia employees, installed Zebra printers and implemented a version of the PDMSS program at San Angelo.  (Doc. 75-4; Doc. 75-5, ¶¶ 9–11; Doc. 75-62; Doc. 33, pp. 276–79; Doc. 86-4, ¶¶ 8–9; Doc. 27, p. 39; Doc. 75-3, ¶¶ 10–30; Doc. 75-8, ¶¶ 2–10; Doc. 75-33, pp. 18–19; Doc. 75-9; Doc. 75-11; Doc. 75-21, ¶¶ 3–6).

The computer program that Mr. Keller and Mr. Sampson implemented printed tags for parts that had been removed from an aircraft and tracked those parts once they were shipped from San Angelo.[2]  (Doc. 86-4, ¶ 9).  The tracking aspect of the Keller/Sampson PDMSS program operated at the tail end of the depopulation process.  A second program that Mr. Mohr developed separately in 2007 also had a tracking function, but that tracking function assisted mechanics on the front end of the depopulation process, in part by providing hyperlinks that enabled mechanics to access pictures of the parts that they needed to remove from a helicopter.  (Doc. 86-4, ¶¶ 3–4, 7, 10; Doc. 75-11).

Mr. Mohr's 2007 program began simply enough as a series of Excel spreadsheets into which Mr. Mohr transferred parts information from paper

---

[2] The parties dispute the exact nature of the computer program that was in use at San Angelo. While the Court recounts the facts as a whole in the light most favorable to Mr. Mohr, this section, in particular, relies heavily on Mr. Mohr's declaration in which he described PDMSS and its relationship to the computer program over which he claims ownership.  (*See* Doc. 86-4). The defendants have placed substantial evidence in the record that conflicts with Mr. Mohr's characterization, including the contract and statement of work under which Robbins-Gioia implemented PDMSS at San Angelo (Doc. 75-4); the sworn statements of the individuals at Robbins-Gioia, DynCorp, and the U.S. government responsible for bringing PDMSS to San Angelo (Docs. 75-3, 75-8, 75-21, 75-5); Mr. Mohr's own statements made in the course of this action and when PDMSS was being introduced at San Angelo (Doc. 27, p. 39; Doc. 33, pp. 113–17; Doc. 75-10, pp. 35–141, 150–59; Doc. 75-9; Doc. 75-11; Doc. 75-13; Doc. 75-14; Doc. 75-15; Doc. 75-16; Doc. 75-17; Doc. 75-20; Doc. 75-30; Doc. 75-31; Doc. 75-32; Doc. 75-62); and references to PDMSS within the source code registered by Mr. Mohr (Doc. 70-1, p. 12; Doc. 75-37, ¶¶ 43–77).  "As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).  Because the Court can resolve the pending motions for summary judgment without reaching the issue, the Court will not consider whether Mr. Mohr's declaration should be discounted because it is blatantly contradicted by the record.

documents.  Mr. Mohr "divided the spreadsheets into notebooks based on all the sections of the helicopter."  (Doc. 86-4, ¶ 3).  Eventually, Mr. Mohr built a Visual Basic interface with buttons that corresponded to each section of the aircraft.[3]  A click of a button opened the Excel spreadsheets for a helicopter section and allowed mechanics to record whether they had removed a particular part. Mechanics also could access links to pictures of the parts that should be removed. (Doc. 86-4, ¶¶ 3–4; Doc. 75-10, p. 27).

Mr. Mohr began developing this computer program on his own initiative and worked on the program both at home and at San Angelo.  (Doc. 86-4, ¶ 5; Doc. 75-10, p. 153; Doc. 77-8).  In August of 2007, DynCorp changed Mr. Mohr's primary job title from general mechanic to computer programmer IV.  (Doc. 75-12; Doc. 75-10, p. 153).  Mr. Mohr voluntarily installed his spreadsheet program on servers at the San Angelo facility.  (Doc. 86-4, ¶ 5; Doc. 75-59, p. 9; Doc. 75-11).  After Miles Keller and Mark Sampson completed the installation of PDMSS, Mr. Mohr's 2007 program operated alongside the tag printing and shipping inventory report functions of PDMSS.  (Doc. 86-4, ¶ 10; Doc. 75-10, p. 31).

Mr. Sampson supported the PDMSS application on-site at San Angelo for approximately nine months as a Robbins-Gioia employee.  (Doc. 86-4, ¶ 12; Doc.

---

[3] Visual Basic is a computer programming language.  *See Visual Basic Programming Guide*, MICROSOFT DEVELOPER NETWORK,  https://msdn.microsoft.com/en-us/library/y4wf33f0.aspx (last visited Aug. 12, 2016).

75-19; Doc. 75-8, ¶ 9).   Mr. Sampson then joined DynCorp "as a computer programmer supporting and updating the PDMSS program."   (Doc. 86-4, ¶ 12; Doc. 75-8, ¶ 11).  Mr. Sampson and Mr. Mohr studied ASP.NET and learned how to use that computer language to create applications that could be accessed through a web browser.[4]  (Doc. 75-10, p. 30).

Beginning in 2008, using ASP.NET, Mr. Mohr and Mr. Sampson worked together to create a computer program that would track all the parts of a helicopter, print part tags, and generate status reports on the depopulation process.  (Doc. 86-4, ¶ 14; Doc. 75-10, p. 33; Doc. 27, pp. 30–31, 39, 54, 63).  They completed their program in 2010 and named it the Aviation Maintenance Inventory Program or AMIP.  (Doc. 86-4, ¶ 16; Doc. 75-10).  AMIP relied upon the database created for PDMSS.  (Doc. 75-10, p. 152–54).

In December of 2009, while still a civilian government employee, Bud Sowers asked Mr. Mohr for his resume in connection with a position at SES, which had recently won a subcontract from Boeing to perform the depopulation of Apache helicopters.  (Doc. 27, p. 41–42; Doc. 75-36; Doc. 72-3, p. 13).  SES hired Mr. Mohr as a production manager in January of 2010.  (Doc. 107-5).  When he left DynCorp, at Mr. Sowers's direction, Mr. Mohr made a copy of the PDMSS

---

[4] "ASP.NET is an open source web framework for building modern web applications and services."  ASP.NET, http://www.asp.net/ (last visited August 12, 2016).

database and brought that copy and the AMIP program with him to SES. (Doc. 86-4, ¶ 18; Doc. 75-10, pp. 151–54; Doc. 33, p. 119).

Early in 2010, Mr. Mohr took steps to register a copyright for the AMIP computer program. (Doc. 33, p. 120–21). Mr. Mohr contends that in seeking a copyright for AMIP, he was acting on the advice of Bud Sowers. (Doc. 75-10, pp. 160–62). Mr. Sowers recalls having a conversation with Mr. Mohr at San Angelo in which the subject of copyright protection was raised, but denies that he intended for Mr. Mohr to copyright AMIP. (Doc. 72-3, pp. 44–45, 65–66). As part of his copyright application, Mr. Mohr deposited a portion of the AMIP source code with the U.S. Copyright Office, but he did not deposit or preserve the full source code as it existed at that time. (Doc. 75-10, pp. 40–41). The Copyright Office issued a copyright registration for AMIP to Mr. Mohr on February 24, 2010. The certificate of copyright registration states that Mark Sampson is a co-author of the registered AMIP program. (Doc. 35-3).[5]

At SES, Mr. Mohr helped set up the depopulation production lines and the computer hardware SES's mechanics would need to use AMIP. (Doc. 27, pp. 44–45; Doc. 77-7; Doc. 75-10, pp. 176–78; Doc. 72-17, pp. 10–11). Mr. Mohr also drafted a license that allowed SES to use AMIP without paying a licensing fee. The license provided that SES's right to use AMIP for free would continue "for an

---

[5] In December 2013, Mr. Sampson signed a document titled "Assignment of Copyright" that purports to transfer Mr. Sampson's interest in AMIP to Mr. Mohr. (Doc. 35-2).

unlimited period of time" in the event of Mr. Mohr's voluntary separation from SES. (Doc. 35-5). The license agreement is unsigned, and the record does not paint a clear picture of which SES employees—if any—received a copy of the license. (Doc. 27, pp. 46–51; Doc. 35-5; Doc. 72-3, pp. 45–46; Doc. 75-10, pp. 162–63, 170–75; Doc. 107-4; Doc. 72-17, p. 8).

Mr. Sowers remained a government employee until February of 2012, at which point he retired for approximately six months. (Doc. 72-3, p. 12). After the Apache depopulation effort was underway, SES began work on a contract to depopulate Blackhawk helicopters and hired Mr. Sowers out of retirement to help manage that process. (Doc. 72-3, pp. 34–35, 61–62). Mr. Sowers asked Mr. Mohr to develop a version of AMIP that mechanics could use to track the depopulation of Blackhawks. Mr. Mohr complied by making a copy of the AMIP source code and renaming it BMIP. (Doc. 75-10, pp. 206–08; Doc. 27, pp. 59–64). Later, Mr. Mohr followed the same process to create another version of AMIP—called DMIP—that tracked the depopulation of Apache Delta model helicopters. (Doc. 75-10, 209–10; Doc. 27, p. 72; Doc. 35-8). After he copied them from AMIP, Mr. Mohr modified BMIP and DMIP to meet the needs of the particular projects that the respective programs supported. (Doc. 33, pp. 40–55; Doc. 35-7).

As the number of programs in use grew, so did Mr. Mohr's responsibilities. Mr. Mohr served as "the database administrator, the computer programmer, the

systems administrator, the subject matter expert, the production planner, [and] the production manager."   (Doc. 27, p. 53; Doc. 33, pp. 15–27; Doc. 107-5). Immediately after Mr. Mohr installed AMIP on SES's servers, approximately four mechanics used the program during the depopulation process.   The number of individuals using AMIP and programs based on its source code grew to more than 200 during Mr. Mohr's employment with SES.  (Doc. 27, p. 54).

The increased workload took a toll on Mr. Mohr, and in 2011, he began to miss work due to poor health.  (Doc. 33, p. 22).  Mr. Mohr also became concerned that SES was attempting to unfairly exploit him and the AMIP source code.  (Doc. 75-10, p. 210).  Following a meeting between SES and Boeing in March of 2012, in which he was asked to provide Boeing with remote access to AMIP, Mr. Mohr tendered his resignation, but then decided to continue working for SES after meeting with his supervisor.  (Doc. 33, pp. 28–40; Doc. 46-1; Doc. 72-4, pp. 39–40).  Shortly afterward, in March of 2012, Mr. Mohr wrote to Mr. Sowers, "I just want to be happy again and I can[']t when I am worried if my job is using me and will take what they can from me then kick me away."  (Doc. 46-1, p. 2).

SES increased Mr. Mohr's salary by approximately 50% in early 2013, but the relationship between Mr. Mohr and SES continued to deteriorate along with Mr. Mohr's physical condition.  (Doc. 33, pp. 69–70; Doc. 75-10, pp. 214–20, 249–53, 262–65).  In March of 2013, Mr. Sowers directed Mr. Mohr to begin work

on a version of AMIP that could support the depopulation of Cobra helicopters. (Doc. 33, pp. 68–69).   The following month, Mr. Mohr sent a letter through counsel to the president of SES complaining that SES had exceeded the scope of the license provided by Mr. Mohr, violated the copyright on AMIP, and created a hostile work environment.  (Doc. 33, pp. 70–74; Doc. 72-15; Doc. 75-10, pp. 220–25).  An executive from SES met with Mr. Mohr to discuss the issues raised in the letter and the possible purchase of the AMIP copyright, but no agreement was reached.  (Doc. 33, pp. 75–85; Doc. 75-10, pp. 225–38; Doc. 75-45).  On October 23, 2013, counsel for Mr. Mohr sent a letter to counsel for SES purporting to give notice of Mr. Mohr's involuntary resignation and requesting that SES confirm in writing that it would cease use of AMIP, BMIP, and DMIP by the end of the next day.  (Doc. 35-10).

In September of 2013, SES began developing a computer program called Aircraft Inventory Repair, or AIR, to replace AMIP, BMIP, and DMIP.  (Doc. 72-12, pp. 30–31; Doc. 72-17, p. 6).  SES deployed Black Hawk AIR to replace BMIP in January of 2014.  (Doc. 72-12, p. 31).  SES deployed Apache Air in April of 2014, but continued to use DMIP for some weeks after that.  (Doc. 72-12, p. 41).  To implement the printing function in both versions of AIR, SES copied portions of the DMIP source code.  (Doc. 72-12, pp. 31–32; Doc. 72-17, pp. 5–6).

This lawsuit followed Mr. Mohr's departure from SES.

## IV.    Discussion

### A.    Copyright Infringement Claim

Copyright protection is a complex area of the law.  Counsel for the parties have provided wide-ranging legal arguments regarding the scope of Mr. Mohr's copyright and the merits of his infringement claim.  Ultimately, though, Mr. Mohr's claim rises and falls on fundamental propositions of copyright law.  First, Mr. Mohr must demonstrate that the Court may exercise jurisdiction over his infringement claim.  Then, "[t]o make out a prima facie case of copyright infringement, [Mr. Mohr] must show that (1) [he] owns a valid copyright in the [work] and (2) defendants copied protected elements from the [work]."  *Smith v. Casey*, 741 F.3d 1236, 1241 (11th Cir. 2014) (quoting *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011)) (internal quotation marks omitted and alterations in original).  Mr. Mohr's copyright infringement claim fails as a matter of law because he cannot satisfy either prong of a prima facie case for the copyright claim over which the Court may exercise jurisdiction.

### 1.    Subject Matter Jurisdiction

The Court's examination of Mr. Mohr's copyright infringement claim begins with the most fundamental question of all:  to what extent does the Court have jurisdiction over Mr. Mohr's copyright claim?  The answer to that question lies in

Mr. Mohr's copyright registration.  As the Eleventh Circuit Court of Appeals explained in *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*:

> The Copyright Act provides that:
>
>> no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.
>>
> 17 U.S.C. § 411(a) (West Supp.1990).  The registration requirement is a jurisdictional prerequisite to an infringement suit.

903 F.2d 1486, 1488 (11th Cir. 1990).  Thus, this Court has subject matter jurisdiction over an infringement claim concerning the work for which Mr. Mohr obtained a copyright registration.  Pursuant to 17 U.S.C. § 101, "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work."

Mr. Mohr's copyright registration is dated February 24, 2010.  The title of the registered work is "AMIP (Aviation Maintenance Inventory Program)."  (Doc. 35-3).  According to the certificate of registration, the registered work, the AMIP computer program, was completed in 2010, and Mr. Mohr and Mr. Sampson are the authors of the registered work.  (*Id.*).

As discussed in greater detail below, the precise scope of the work for which Mr. Mohr registered a copyright is unknown and unknowable because Mr. Mohr deposited only a portion of the AMIP source code with the U.S. Copyright Office

when he registered his copyright in February 2010.  (Doc. 75-10, pp. 40-41).  But this much is certain – the registered program is not the work that Mr. Mohr created in 2007 to enable DynCorp mechanics to record in computer-generated spreadsheets the numbers for the parts that the mechanics removed from various helicopter sections.

It is undisputed that in 2007, Mr. Mohr used Excel, a computer program available through Microsoft, to create spreadsheets into which he could manually type parts information that DynCorp mechanics wrote by hand in documents that they created as they removed helicopter parts.[6]  (Doc. 86-4, ¶ 3).  In time, Mr. Mohr wrote code that enabled the mechanics to input the parts information into digital versions of the Excel spreadsheets.  (Doc. 86-4, ¶ 4).  The "2007 program tracked every part of a depopulated Apache in terms of whether the part was removed from or remained on the aircraft."  (Doc. 86-4, ¶ 7).  The "2007 program did not print any tags" for parts that mechanics removed from helicopters; "all tags were manually filled out by the mechanic."  (*Id.*).[7]

---

[6] Excel is a data-management application available as part of the Microsoft Office software suite. MICROSOFT, http://products.office.com/en-us/excel (last visited August 30, 2016).

[7] Again, consistent with the Court's obligation to view the evidence in the light most favorable to Mr. Mohr, in tracing the development of the AMIP program, the Court relies heavily on Mr. Mohr's June 26, 2015 declaration.  (Doc. 86-4).  That document contains Mr. Mohr's most recent, comprehensive description of the development of the AMIP program.  (*Compare* Doc. 75-10, the transcript of Mr. Mohr's December 2014 deposition).

The AMIP program for which Mr. Mohr has a registered copyright is substantially different from the 2007 program. First, Mr. Mohr developed the program with Mark Sampson after Mr. Sampson became a DynCorp employee in 2008. (Doc. 86-4, ¶ 14; Doc. 72-2, p. 29, lines 18–23). Second, Mr. Mohr and Mr. Sampson "implemented a driver" in the AMIP program which "allowed the program to print tags" using Zebra printers installed at DynCorp's San Angelo facility where Mr. Mohr worked. (Doc. 86-4, ¶ 14). Mr. Mohr explained that his 2007 program could not print tags because his 2007 program "was built on a different framework than" the program that operated the Zebra printers. (Doc. 86-4, ¶ 14). In Mr. Mohr's words, he and Mr. Sampson "wrote completely fresh printing functionality source code." Third, the AMIP program is written in ASP.net, a computer language used to develop web applications. The AMIP program allowed users to access helicopter parts data stored in an SQL database through a web browser, a feature not shared by the 2007 program. (Doc. 33, pp. 230–31; Doc. 75-10, pp. 180–81; Doc. 72-12, p. 5).[8]

There is no doubt that the AMIP program stems from the concept of electronically organizing parts data, the very concept that prompted Mr. Mohr to create Excel parts spreadsheets in 2007. But the registered AMIP program is

---

[8] In answer to an interrogatory posed by the defendants, Mr. Mohr responded, "My copyrighted source code is not based, in whole or in part, on any previous works." (Doc. 75-59, p. 6).

18

distinct from the 2007 spreadsheet program for copyright purposes because a copyright protects an expression, not an idea.  17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea. . . ."). *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1286 n.25 (11th Cir. 2014) ("As noted, copyright protects expression, and not the underlying ideas a work contains.").  The AMIP program, the work that Mr. Mohr registered in 2010, is a separate work from Mr. Mohr's 2007 program.

Thus, the Court may exercise jurisdiction over Mr. Mohr's copyright infringement claim as it pertains to the fully-automated AMIP web-based computer program that Mr. Mohr registered in February 2010.

### 2.  Copyright Ownership

### a.  Work Made for Hire

SES argues that Mr. Mohr's copyright infringement claim fails at the first step of the copyright infringement analysis because Mr. Mohr cannot prove that he owns a valid copyright in the AMIP program.  SES contends that the program is a "work made for hire," meaning that Mr. Mohr's job responsibilities included computer programming, and he created the AMIP program in the performance of his employment responsibilities such that the rights to the 2010 AMIP program belong to Mr. Mohr's employer, not Mr. Mohr.  Although the Court has located no opinion in which the Eleventh Circuit Court of Appeals has used the explicit

phrase "affirmative defense," it is clear that the Eleventh Circuit regards the "work-for-hire" doctrine as such.

In *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990), after discussing the statutory basis for the work-for-hire doctrine, the Eleventh Circuit stated:

> we hold that Ameron [the alleged infringer] does have the right to assert this defense. It is not unheard of, as MGB asserts, for the "work-for-hire" issue to arise "as a defensive tactic adopted by a third-party infringer to dispute the validity of the plaintiff's copyright." *Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,* 815 F.2d 323, 333 (5th Cir.1987), *cert. denied,* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).

*Id.* at 1490 (footnote omitted).[9]  Moreover, relying on the express language of the Copyright Act, the Eleventh Circuit has held that proof of a valid certificate of copyright registration "'shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.' 17 U.S.C. § 410(c) (1996). 'Once the plaintiff produces a certificate of copyright, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid.'" *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1554 (11th Cir. 1996) (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996)).

---

[9] Mr. Mohr argues that SES cannot defend against his claim of copyright infringement by invoking the work-for-hire doctrine because SES does not have standing to assert the rights of a third-party, like DynCorp.  (Doc. 76, pp. 16–18).  *M.G.B. Homes* squarely disposes of that argument.

Other circuits uniformly have held expressly that the work-for-hire doctrine is an affirmative defense on which the defendant bears the burden of proof. *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 105 (2d Cir. 2002); *MacLean Associates, Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 771 (3d Cir. 1991); *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005); *Allan v. Springville City*, 388 F.3d 1331, 1336 (10th Cir. 2004); *see also Fun Spot of Florida, Inc. v. Magical Midway of Cent. Florida, Ltd.*, 242 F. Supp. 2d 1183, 1186 (M.D. Fla. 2002).   Therefore, the Court treats the doctrine as an affirmative defense and evaluates the relevant evidence accordingly.[10]

The Court's analysis begins with the certificate of registration for the AMIP program.  The certificate states that the program is not a work made for hire.  (Doc.

---

[10] Citing an unpublished Ninth Circuit opinion, SES states:

> The Copyright Act presumes that a work prepared by an employee within the scope of his employment belongs to the employer "unless the parties have expressly agreed otherwise in a written instrument signed by them, . . ." 17 U.S.C. § 201(b).  It is *Plaintiff's* burden to overcome this presumption by proving that a contrary agreement was reached with DynCorp. *See, e.g. Wilkes v. Rhino Records,* No. 96-56238, 1997 U.S. App. LEXIS 35721 at *4 (9th Cir. Dec. 4, 1997) (stating that plaintiff failed to present sufficient evidence on summary judgment to overcome work for hire presumption).

(Doc. 96, p. 24) (emphasis in SES brief).  In *M.G.B. Homes*, the Eleventh Circuit discussed the Supreme Court's opinion in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and expressly rejected the proposition that the work-for-hire doctrine creates a rebuttable presumption on which the plaintiff carries the burden of proof.  *M.G.B. Homes,* 903 F.2d at 1491.  SES cited the *M.G.B. Homes* opinion in its summary judgment briefs (Doc. 74, p. 49; Doc. 96, p. 23 n. 10) but did not discuss this aspect of the decision in its briefs.  The Court will discuss the *Reid* opinion shortly.

35-3).  The certificate, then, constitutes prima facie evidence that the 2010 AMIP program is not a work made for hire.  *MiTek Holdings, Inc.*, 89 F.3d at 1554.  For SES to prevail on its affirmative defense, the evidence in the record must demonstrate that the certificate is incorrect and that under the Copyright Act, Mr. Mohr's employer, DynCorp, is considered the author of the program.

Under the Copyright Act, 17 U.S.C. §§ 101–1332, "[c]opyright in a work . . . vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author . . . , and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  17 U.S.C. § 201(b).  The Copyright Act defines a "work made for hire" as "a work prepared by an employee within the scope of his or her employment . . . ."  17 U.S.C. § 101.

The parties agree, and the record leaves no doubt, that Mr. Mohr was an employee of DynCorp when he developed AMIP.[11]  DynCorp hired Mr. Mohr in June of 2005.  (Doc. 27, pp. 32–33; Doc. 75-36, p. 4; Doc. 75-10, p. 12; Doc. 75-59, p. 4).  Mr. Mohr remained a DynCorp employee until January of 2010.  (Doc. 27, p. 33; Doc. 75-59, p. 4).  AMIP was "authored, created, developed, and

---

[11] For purposes of ruling on the parties' motions for summary judgment, the Court assumes that AMIP was developed jointly by Mr. Mohr and Mr. Sampson and that Mr. Sampson assigned his interest in the AMIP source code to Mr. Mohr.  (*See* Doc. 35-3 (AMIP copyright registration listing Mr. Mohr and Mr. Sampson as co-authors); Doc. 35-2 (assignment of AMIP copyright from Mr. Sampson to Mr. Mohr)).

completed prior to [Mr. Mohr's] employment at SES," which began on January 15, 2010.  (Doc. 75-60, p. 2; Doc. 75-10, pp. 33–34; Doc. 107-5, p. 1).  Therefore, AMIP is a work prepared by a DynCorp employee.  But that, by itself, is not enough to constitute a work made for hire.

The statutory definition of a "work made for hire" also requires the Court to examine whether creating AMIP fell within the scope of Mr. Mohr's employment. 17 U.S.C. § 101.  "Scope of employment" is a term of art.  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989).  "It is . . . well established that [w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."  *Field v. Mans*, 516 U.S. 59, 69 (1995) (internal quotation mark omitted and alterations in original) (quoting *Reid*, 490 U.S. at 739).

In *Reid*, the Supreme Court referred to "the general common law of agency" as articulated in the Restatement (Second) of Agency § 228 (1958) when interpreting the meaning of terms like "employee," "employer," and "scope of employment" under the Copyright Act.  *Reid*, 490 U.S. at 740.  Under the Restatement (Second) of Agency, "[c]onduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is

actuated, at least in part, by a purpose to serve the master . . . ."  Restatement (Second) of Agency § 228(1) (1958).  A servant's conduct does not fall "within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."  Restatement (Second) of Agency § 228(2).

After the Supreme Court issued the *Reid* decision, the American Law Institute published a new Restatement of Agency.  Under the Restatement (Third) of Agency, "[a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control."   Restatement (Third) of Agency § 7.07(2) (2006). Conversely, "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."  *Id.*   Under the formulation of "scope of employment" in both the Restatement (Second) and the Restatement (Third), the employee's intent is important.[12]

Under either version of the Restatement's criteria for agency, the record demonstrates conclusively that Mr. Mohr's work on AMIP was within the scope of his employment with DynCorp.

---

[12] The Eleventh Circuit evaluated the Restatement (Second) definition of scope of employment in *M.G.B. Homes*.  The Court has located no opinion in which the Eleventh Circuit has examined the definition of "scope of employment" under the Restatement (Third) in the context of a copyright case.

The record establishes that Mr. Mohr's conduct in creating the AMIP program was the type of work DynCorp employed him to perform. When Mr. Mohr and Mr. Sampson began writing the code for the program, DynCorp's job title for each was "computer programmer." (Doc. 33, p. 122; Doc. 75-8, ¶¶ 11, 14; Doc. 75-10, p. 155; 75-12; Doc. 75-21, ¶ 8; Doc. 86-4, ¶ 12). In Mr. Mohr's May 2008 performance review, DynCorp lauded Mr. Mohr because he could be "given the end product desire[d] and he [would] design a program to do it." (Doc. 75-18, p. 4). The manager who completed the review explained that because of Mr. Mohr's skills and his ability to "handle[] all computer programming for our facility," DynCorp's customer, the United States Army, did not have to hire another contractor to handle programming of the computers at the San Angelo facility. (Doc. 75-18, p. 4). When asked in his deposition if one of the things he did for DynCorp was work on the AMIP program, Mr. Mohr replied, "Yes, sir." (Doc. 75-10, p. 153).

The record also demonstrates that Mr. Sampson and Mr. Mohr completed much of the work within authorized time and space limits. Mr. Mohr testified that he worked on the AMIP program at the San Angelo facility and at home. (Doc. 33, p. 122; Doc. 75-10, p. 153).[13] At the San Angelo facility, Mr. Mohr and Mr.

---

[13] There is ample evidence that DynCorp knew that Mr. Mohr worked long hours, and the company did not discourage Mr. Mohr from doing so. (*See*, *e.g.*, Doc. 75-18, pp. 3-4; Doc. 75-20, p. 2). Even if that were not the case, the work that Mr. Mohr performed at home would not

Sampson shared an office.  (Doc. 75-8, ¶¶ 15–16).  There is no evidence in the record that Mr. Sampson worked on the AMIP program at Mr. Mohr's home; it appears from the record that the two men coordinated their efforts at the San Angelo facility.  Mr. Mohr used servers and other equipment located at the San Angelo facility to develop AMIP.  (Doc. 75-21, ¶ 17; Doc. 75-59, p. 9, # 12). When the memory for the computer that he was using to design the AMIP program was not adequate for the task, Mr. Mohr asked permission for a computer upgrade from Terry Hurley, one of Mr. Mohr's superiors at DynCorp.  (Doc. 75-17, p. 2; Doc. 75-18, p. 5; Doc. 75-21, ¶ 16).

As evidenced by various email exchanges, Mr. Mohr consulted with DynCorp personnel and U.S. government personnel as he and Mr. Sampson created the AMIP program to ensure that the program would serve DynCorp's purposes well.  (Docs. 75-13, 75-14, 75-15, 75-16, 75-18, 75-31).[14]  For example in a 2008 email, Mr. Mohr asked recipients with U.S. Army email addresses like

---

automatically exempt AMIP from the application of the work-for-hire doctrine.  *See Le v. City of Wilmington*, 736 F. Supp. 2d 842, 849–50 (D. Del. 2010), *aff'd*, 480 Fed. Appx. 678 (3d Cir. 2012) (citing *Genzmer v. Public Health Trust of Miami–Dade County*, 219 F. Supp. 2d 1275, 1281–82 (S.D. Fla. 2002), and *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1058 (S.D. Iowa 2007)) (holding employee cannot avoid application of work-for-hire doctrine solely based on performing work off-hours at home); *Miller v. CP Chems., Inc.*, 808 F. Supp. 1238, 1240, 1244 (D.S.C.1992) (finding employer owned copyright on computer programs created by employee—at employee's home, and for which employee received no compensation—solely for purpose of simplifying employee's work-related duties); *Marshall v. Miles Labs., Inc.*, 647 F. Supp. 1326, 1330 (N.D. Ind.1986) (stating that work-for-hire doctrine cannot be avoided merely by preparing work during non-working hours in place not controlled by employer).

[14] The documents cited refer to PDMSS, but Mr. Mohr asserts that PDMSS is simply an early name for AMIP.  (Doc. 86-4, ¶ 16).

his to review some of his work "and let [him] know if that's how it[']s suppose[d] to be or should a change be made." (Doc. 75-14, p. 2). In another 2008 email, Mr. Mohr advised that he made requested changes to the AMIP program. (Doc. 75-15, p. 2). This evidence demonstrates not only that Mr. Mohr tailored his work to serve DynCorp's purposes but also that DynCorp controlled the work that Mr. Mohr and Mr. Sampson were doing on the program. Another email from 2008 forecloses any doubt about Mr. Mohr's purposes. In the email, Mr. Mohr made clear his understanding of the importance to DynCorp of the program he was writing and his commitment to the success of the program. (Doc. 75-20, p. 2).

Thus, the record demonstrates that creation of the AMIP program was the kind of work that DynCorp employed Mr. Mohr to perform, Mr. Mohr worked on the program within authorized time and space limits, Mr. Mohr's work on the AMIP program was subject to DynCorp's control, and Mr. Mohr intended the AMIP program to serve DynCorp's purposes and meet DynCorp's needs. There is no dispute of material fact in this regard. *See* Restatement (Second) of Agency § 228(1)(a); Restatement (Third) of Agency § 7.07(2).

Given the state of the facts and law as described above, only a written agreement that expressly assigned all copyright interests in AMIP to Mr. Mohr could prevent DynCorp from being considered the author of AMIP under the Copyright Act. *See* 17 U.S.C. § 201(b). The record discloses exactly the opposite.

Mr. Mohr executed an employee agreement with DynCorp in which he agreed to "promptly make full disclosure and assign to the Company any ideas, discoveries, inventions, developments or improvements conceived or made by me, either solely or jointly with others, during the period of my employment with the Company relating to Company business, development programs or contemplated interests." (Doc. 75-29).  The undisputed facts in the record compel the conclusion that the requirements of the work-for-hire doctrine are satisfied, and Mr. Mohr is not the author of AMIP for purposes of a copyright action.

### b.   Estoppel

Mr. Mohr argues that even if his copyright in AMIP is invalid, he should prevail on his copyright infringement claim because SES and Mr. Sowers should be estopped from asserting the invalidity of his copyright.  (Doc. 76, pp. 18–21). Counsel for Mr. Mohr acknowledges that no court has endorsed the theory that a party may invoke the equitable principle of estoppel to establish an infringement claim, but that, of course, is not dispositive.  (Docs. 76, 109).  The Court concludes that Mr. Mohr's estoppel argument fails not because it is novel but because the record does not support Mr. Mohr's argument.

"The doctrine of equitable estoppel is grounded in fairness."  *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012).

> In all cases, the lynchpin for equitable estoppel is equity, and the point
> of applying it . . . is to prevent a situation that would fly in the face of

fairness. The purpose of the doctrine is to prevent a [party] from, in effect, trying to have his cake and eat it too.

*Id.* (quoting *In re Humana Inc. Managed Care Litigation*, 285 F.3d 971, 976 (11th Cir. 2002) (citations omitted) (internal quotation marks omitted), *rev'd on other grounds sub nom. PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401 (2003)). Applied here, estoppel would prevent SES and Mr. Sowers from "relying on the [AMIP copyright] when it works to [the defendants'] advantage" and "repudiating it when it works to [the defendants'] disadvantage." *Id.*

There are five elements of federal common law equitable estoppel:

"(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation."

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013) (quoting *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008)).  Mr. Mohr asserts that equitable estoppel should save his infringement claim because Bud Sowers urged him to copyright his code, SES represented that it owned the AMIP copyright, and SES profited from the seeming validity of the copyright.  (Doc. 76, p. 18; Doc. 109, pp. 84–95).  None of these arguments persuades the Court.

It would "fly in the face of fairness" to apply the doctrine of estoppel to Mr. Sowers.  Assuming for purposes of summary judgment that Mr. Sowers urged Mr.

Mohr to copyright the AMIP program, Mr. Sowers did so as an employee of the U.S. Army; Mr. Mohr obtained his copyright registration on February 24, 2010, but Mr. Sowers did not leave his civilian job with the U.S. Army and join SES until 2012. (Doc. 35-3; Doc. 72-3, p. 12). There is no evidence that Mr. Sowers understood the legal implications of the work-for-hire doctrine such that he would have appreciated the fact that Mr. Mohr could not obtain a valid copyright for the AMIP program because DynCorp owned the rights to the AMIP source code.

As between Mr. Sowers and Mr. Mohr, if either of them was aware of the work-for-hire concept in 2010, the record demonstrates that it was Mr. Mohr. The copyright certificate that he received in February 2010 explicitly states that AMIP is not a "work made for hire." (Doc. 35-3). Mr. Mohr must have provided that information in his January 2010 copyright application. (Doc. 33, pp. 120-21). Mr. Mohr explained that he indicated in his copyright application that Mr. Sowers should have "rights and permissions" for the copyright because "there was a lot of government-stuff entailed in the program, and I just wanted to do it . . . the right way." (Doc. 33, p. 121).[15] Thus, even if he did not understand the finer points of the work-for-hire doctrine in 2010, Mr. Mohr was aware generally, at a minimum, that others such as the U.S. Army had an interest in the AMIP program.

---

[15] Mr. Mohr did not have assistance of counsel when he completed his copyright application. (Doc. 33, p. 121).

Mr. Mohr's estoppel argument fares no better with respect to SES.  There certainly is plenty of evidence in the record that SES used the AMIP program to its advantage in its contract negotiations with Boeing, and SES obtained lucrative contracts with Boeing because of SES's ability to manage the depopulation process efficiently with the use of AMIP, BMIP, and DMIP.  But there is no evidence that SES knew when it engaged in those negotiations that the AMIP program belonged to DynCorp rather than Mr. Mohr.  Mr. Mohr received his certificate of copyright registration just a few weeks after he went to work for SES.  Mr. Mohr gave SES written authorization to use AMIP a few weeks after he received the copyright certificate.  (Doc. 35-5).  In the license, Mr. Mohr represented that he owned the copyright for AMIP.  (*Id.*).

The record reflects two conversations between Mr. Mohr and SES personnel concerning the ownership of AMIP early in Mr. Mohr's employment with SES.  One conversation took place between Mr. Mohr and SES's IT manager when Mr. Mohr attempted to load AMIP onto SES's servers.  (Doc. 72-17, pp. 6–8).  When asked if he had an end user license agreement that would allow SES to use AMIP, Mr. Mohr responded that AMIP was his and SES could have it.  (Doc. 72-17, pp. 7–8).  During a second conversation, Mr. Mohr's supervisor at SES requested permission from Mr. Mohr to use AMIP.  (Doc. 75-10, pp. 160–62; Doc. 27, p. 46).  Such a request is consistent with Mr. Mohr's supervisor's understanding that

AMIP belonged to Mr. Mohr.  Thus, there is no evidence that SES was aware of the true fact that DynCorp, not Mr. Mohr, owned the AMIP program.  If anyone knew the true facts concerning the circumstances under which the AMIP program was created, it was Mr. Mohr, not SES.  The fact that SES benefitted from the AMIP program is not sufficient to support application of the doctrine of equitable estoppel.

Absent evidence of some form of conduct that has unfairly tipped the scales of justice, the Court cannot use equitable estoppel to prevent the dismissal of a claim that is legally insufficient.  Therefore, SES is not estopped from asserting the work-for-hire defense to Mr. Mohr's copyright infringement claim.

### 3.   Copying of Protected Elements

Even if Mr. Mohr could demonstrate that he owns a valid copyright, his claim still would fail as a matter of law because he cannot prove that SES has infringed his copyright on the 2010 AMIP program.  *Smith v. Casey*, 741 F.3d 1236, 1241 (11th Cir. 2014).  "The mere fact that a work is copyrighted does not mean that every element of the work may be protected."  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991).  A plaintiff may pursue an infringement claim only for "protected expression" that is "of such importance to the copied work that the appropriation is actionable."  *Peter Letterese and Associates, Inc. v. World Inst. of Scientology Enterprises*, 533 F.3d 1287, 1300

(11th Cir. 2008) (internal quotation marks omitted and alterations in original) (quoting *MiTek Holdings, Inc.*, 89 F.3d at 1554); *see also Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (To prove that a work has been copied, "the plaintiff [] must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work *with regard to its protected elements*.") (emphasis in original). To evaluate the second element of an infringement claim, a court must be able to "filter[] out all unprotectable material" in the copyrighted work. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1550 (11th Cir. 1996).

When, as in this case, the copyrighted work is a computer program, the filtering process entails an examination of source code. This is where Mr. Mohr hits an evidentiary roadblock that he cannot surmount because, as noted earlier, he cannot produce a copy of AMIP's source code as it existed when he registered the 2010 AMIP program with the U.S. Copyright Office. (Doc. 75-10, pp. 40–41).

Mr. Mohr has produced 50 computer files that he deposited with the Copyright Office. It is undisputed that those 50 files constitute only a portion of the registered 2010 AMIP program. Mr. Mohr also has produced AMIP_ONE, a work that pre-dates the registered 2010 AMIP program. No file in AMIP_ONE was modified later than September 4, 2009. (Doc. 86-6; Doc. 86-8, ¶ 10.b).[16] SES

---

[16] The admissibility of AMIP_ONE is in dispute. (Docs. 98, 101). For the purpose of assessing Mr. Mohr's ability to establish the elements of a copyright infringement claim, the Court will assume that AMIP_ONE would be admissible at a trial in this action.

has produced SES AMIP, a version of AMIP that post-dates AMIP's registration. (Doc. 86-8, ¶¶ 5–6). The files in SES AMIP were modified between November 8, 2007 and August 23, 2013. (Doc. 86-8, ¶ 10.c). Of the 50 files that Mr. Mohr deposited with the Copyright Office when he registered a copyright on AMIP in 2010, 18 files exactly or closely match at least one file in AMIP_ONE and at least one file in SES AMIP. (Doc. 86-8, ¶ 10.d). Sixteen of the deposited files match only AMIP_ONE or SES AMIP, and sixteen do not match any files in either AMIP_ONE or SES AMIP. (Doc. 86-8, ¶ 10.e, f, g). Thus, Mr. Mohr cannot produce a complete source code for the copyrighted 2010 AMIP program, and the Court cannot perform the required filtering analysis of that program.

Mr. Mohr argues that "AMIP_ONE provides a 'clear roadmap by which to decipher' the content of the copyrighted work . . . ." (Doc. 76, pp. 29–30 (quoting *Indyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp. 2d 1278, 1280–81 (M.D. Fla. 2012), *aff'd*, 513 Fed. Appx. 858 (11th Cir. 2013)). In the opinion of Mr. Mohr's expert, "[m]ost of the lines of the AMIP computer program can be established, as they existed at the time of the copyright registration, by" comparing lines of code that exist in the same form in AMIP_ONE and SES AMIP. (Doc. 86-8, ¶ 14). However, that conclusion is undercut by the expert's own finding that the deposited files include source code that appears in neither AMIP_ONE nor SES AMIP, or appears in only one of those programs. (Doc. 86-8, ¶ 10.e, f, g).

34

Sixteen files, at least, were present in the registered version of AMIP but not in AMIP_ONE or SES AMIP.  Mr. Mohr has offered no means of gauging how many more files appeared only in the registered version of AMIP.  In addition, attempting to reconstruct the registered version of AMIP by comparing AMIP_ONE with SES AMIP leaves open the question of what to do when AMIP_ONE and SES AMIP do not match.  On the evidence presented to the Court, filling these gaps to re-create the registered version of AMIP with source code from either AMIP_ONE or SES AMIP would entail pure speculation.  Therefore, the Court must conclude that Mr. Mohr is unable to produce the copyrighted work, and the Court cannot conduct an infringement analysis.  *See generally InDyne, Inc. v. Abacus Tech. Corp.*, 587 Fed. Appx. 552, 554 (11th Cir. 2014) (affirming an award of attorney's fees to a defendant made by the district court to "deter future litigants from suing for infringement of software copyrights without being able to produce the software code").[17]

### B.    State Law Claims

In addition to his copyright infringement claim based on federal law, Mr. Mohr asserts a series of state law claims in his amended complaint.  (*See* Doc. 35).

---

[17] The Court does not mean to suggest that a copy of source code that predates the certificate of registration for a copyrighted computer program never can be used to identify the original constituent parts of the program.  AMIP_ONE simply is not up to the task in this case.  Mr. Mohr's inability to present a complete version of the copyrighted source code impacts not only the filtering process but also Mr. Mohr's ability to prove that the original aspects of the copyrighted program are substantially similar to the offending program.  *Bateman*, 79 F.3d at 1542.

To date, the Court has exercised supplemental jurisdiction over the state law claims because "they form part of the same case or controversy under Article III of the United States Constitution."   28 U.S.C. § 1367(a).   With the elimination of Mr. Mohr's federal claim, the Court may consider whether it should continue to exercise jurisdiction over Mr. Mohr's state law claims.   28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Colhill*, 484 U.S. 343, 364 n.7 (1988).   This case is not an exception to that general rule.   Although the Court has become familiar with the parties, claims, and evidence in this case, the efforts of the parties and the Court have been directed primarily toward Mr. Mohr's copyright infringement claim. Now that the federal copyright infringement claim is resolved, there is little judicial economy to be gained by retaining jurisdiction over state law claims that have received less attention.

In addition, judicial economy will be served by dismissal of the state law claims to the extent Mr. Mohr takes advantage of the opportunity to assess which of his state law claims potentially remain viable.  When the Court asked whether Mr. Mohr's state law claims could proceed if his copyright infringement claim failed, Mr. Mohr's counsel indicated that the claim for a conspiracy between Mr. Sowers and SES could stand alone.  (Doc. 109, p. 67; Doc. 35, ¶¶ 95–98).  Mr. Mohr's counsel also stated that it was unclear under Alabama case law whether the underlying wrong required to support a conspiracy claim had to be "a tort separate from conspiracy" or could be "a wrong in the broader sense."  (Doc. 109, pp. 68–69).  An Alabama state court is an appropriate forum for an examination of unresolved questions of state law.

Therefore, the Court will dismiss Mr. Mohr's state law claims without prejudice so that Mr. Mohr may pursue those claims in state court if he wishes.  *See* 28 U.S.C. § 1367(d) (setting deadline for filing state law claims in state court following resolution of federal claims).

## V.    Conclusion

For the reasons discussed above, the Court **GRANTS** the defendants' motion for summary judgment.  (Doc. 73).  The Court **DENIES** Mr. Mohr's motion for partial summary judgment.  (Doc. 76).  The Court **DENIES** SES's motions to exclude the report and testimony of plaintiff's expert and to strike as

moot.  (Doc. 70, 98).  The Court **DENIES** Mr. Mohr's motion to supplement his evidentiary submissions as moot.  (Doc. 107).  SES has not pursued its counterclaim.  (Doc. 43).  Therefore, the Court dismisses that claim without prejudice.  By separate order, the Court will enter a final judgment consistent with this memorandum opinion.

      **DONE** and **ORDERED** this August 31, 2016.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE